[No. 305-41273-2.    Division Two.    April 23, 1971.]

A. H. MARSHALL, *Respondent,* v. FOOD, CHEMICAL & RESEARCH
LABORATORIES, INC., *Appellant,* ADHESIVE ENGINEER-
ING CO., *et al., Respondents.*

*Dexter A. Washburn* (of *Jones, Grey, Bayley & Olsen*),
for appellant.

*John A. Gose* (of *Preston, Thorgrimson, Starin, Ellis &
Holman*), *Ralph C. Hove* (of *Wettrick, Toulouse, Lirhus &
Hove*), and *Keith R. Baldwin* (of *Reaugh, Hart, Allison &
Prescott*), for respondent.

PETRIE, C.J.—The defendant, Food, Chemical & Research
Laboratories, Inc. (Food Chemical), a consulting chemical
laboratory, uses highly caustic acids of varying degrees of
strength in its normal day-to-day activities. Food Chemical
was required to move to a new location. It acquired a
leasehold interest in a new building and, among other
things, desired to obtain a type of flooring which would
meet its needs.

To that end, Edwin Johnson, vice-president of Food
Chemical, discussed the matter of appropriate flooring with
a salesman for Madden Construction Supply Co., Inc., a

distributor for construction material. The salesman for Madden represented to Mr. Johnson that an epoxy floor covering known as Concresive 1097, manufactured by Adhesive Engineering Company, was highly acid resistant. Initial samples of Concresive 1097 shown to Mr. Johnson were dark red and dark green in color. Mr. Johnson expressed a desire for a light beige color. Adhesive produced a light beige sample of Concresive 1097—designated 1097-5—in the form of a color chip, which was delivered to Mr. Johnson. A representative of Adhesive told Mr. Johnson that there would be some darkening of the light beige Concresive 1097, and also told him that acids would tend to stain the floor. He chose the light beige sample as the color of the Concresive 1097 flooring that Food Chemical wanted applied to its laboratory floor. Madden recommended to Food Chemical that plaintiff, A. H. Marshall, be hired to apply the Concresive 1097-5.

Marshall entered into an oral contract with Food Chemical to apply Concresive 1097-5 on a square-foot basis. On or about July 1, 1967, Marshall, his son, and an employee of Madden applied a coating of Concresive 1097-5, which was smooth, but, where exposed to the rays of the sun, dramatically darkened from a light beige to a walnut color. Using the same product from the same order, Marshall reapplied a second coating over the prior coating. Immediately upon application, it likewise began darkening, changing color from light beige to a walnut. The second application also has some pockmarking. Immediately thereafter, Food Chemical moved into the building.

In the normal day-to-day business, acids were spilled on the floor and upon contact with the acids, the floor changed color from beige or brown to aquamarine and, in some instances, orange. Such change of color was not anticipated by Food Chemical. At time of trial, the floor covering, Concresive 1097-5, was in excellent physical condition, had not deteriorated from acid spillage, though there had been the change of color. The strength of the floor is excellent and it has protected the concrete which underlies it. The

only effect of the pockmarking, the change of color due to exposure to sunlight, and the change of color due to acid spillage, is in the aesthetic value of the floor covering.

Marshall's application was in a good workmanlike manner, and he explicitly followed all directions of Madden and Adhesive. All representations by Madden's salesmen during the entire transaction were based solely upon information supplied Madden by Adhesive.

Epoxy is a material that has only been used in recent years for flooring. It had not been used as a flooring in any other commercial chemical laboratory in the Northwest at the time of its application by Marshall to Food Chemical's floor. Madden's salesman delivered to Mr. Johnson a copy of Adhesive's technical bulletin AE-187/1, which Johnson read and relied upon.[1] A representative of Adhesive told Johnson that there would be some darkening of the light beige form of Concresive 1097, and also told Johnson that acids would tend to stain the floor.

The foregoing factual summary is a re-recitation of the unchallenged findings of facts entered by the trial court.

Marshall billed Food Chemical the sum of $3,586.96. Food Chemical having refused to pay, Marshall brought this action for payment of the agreed price. Food Chemical answered, contending that the flooring installed failed to meet minimum standards of acceptability, and counterclaimed seeking damages for correction of the condition of the flooring. Marshall answered the counterclaim and brought in, as third party defendants, Madden as seller and Adhesive as manufacturer of the product applied to the floor, contending that any liability with respect to Food Chemical's

---

[1]Technical Bulletin AE-187/1 provides in part:

"*Concresive #1097* A Chemically Resistant Binder for Flooring Mortars and Concrete Coating.

"Concresive #1097 is low viscosity, 100% solids, epoxy system which has outstanding chemical resistance when cured at room temperature. It is recommended as a concrete coating or flooring binder wherever exposure to strong corrosive chemicals is expected. Its resistance to mineral and organic acids is unusually high, in many cases superior to heat cured epoxy materials. It is not recommended for use in areas where white or a pastel color is desired."

counterclaim was the joint and several liability of Madden and Adhesive. Madden cross-complained against Adhesive and also sought, from Marshall, recovery of the cost of materials used. Adhesive sought dismissal of the claims against it by all the other parties.

After trial to the court, judgment was entered in favor of Marshall against Food Chemical in the amount of $3,586.96; in favor of Food Chemical against Adhesive in the same amount; and in favor of Madden against Marshall in the amount of $1,036.87. The net effect, of course, is that Marshall will be paid for his services and material used, Madden will be paid for the material sold to Marshall, Food Chemical receives its discolored and pockmarked (and unwanted) floor free of charge—at the expense of Adhesive, the manufacturer.

Food Chemical has appealed (1) challenging the trial court's entry of several findings of fact (not hitherto alluded to in this opinion), (2) contending the trial court applied the wrong measure of damages, and (3) alleging the trial court erroneously entered judgment in favor of Marshall against Food Chemical and erroneously failed to enter judgment in its favor against Madden and Adhesive jointly and severally.

We explore, first, the several challenged findings of fact and consider four such findings together:

10

That the defendant, Food, Chemical & Research Laboratories, Inc., as lessee, desired to put in *a highly chemically resistant* floor in the building they were leasing from Dr. Peniston and Mr. Johnson *to protect the underlying concrete floor.*

12

That the salesman from Madden Construction Supply Co., Inc., represented that a product, Concresive 1097, which was an epoxy floor covering, was highly acid resistant. That epoxy is a material that has only been used in recent years for flooring. That it is not used in any other commercial chemical laboratory in the northwest. *That the primary purpose of using an epoxy floor cover-*

*ing is to protect the concrete subflooring from erosion and disintegration from contact with acids.*

### 32

That the strength of the floor covering, Concresive 1097-5, is excellent. That it has protected the concrete that underlies it. That the floor covering, Concresive 1097-5, is in *excellent functional condition.*

### 33

That the change of color in the floor covering, Concresive 1097-5, due to exposure to sunlight, *the pockmarking and the change in color* where it has suffered acid spillage *do not affect the functional value of the floor covering,* Concresive 1097-5. That the only effect of these items is upon the aesthetic value of said floor covering.

(Food Chemical has assigned error only to the italicized portions of these findings.)

Assignments of error to instructions 10 and 12 were precautionary, so as to avoid any implication that Food Chemical's *sole* or even *primary* motivation for desiring a highly chemically resistant floor topping was to protect the underlying concrete floor. Similarly, assignments of error to instructions 32 and 33 raise objections to any implication that a "functional" floor be equated with "protection of the concrete substrate," and therefore, equated with performance of the contract.

The concept of a "functional" quality of epoxy appears to have been introduced into the record by Food Chemical's vice-president. When asked to express his opinion as to the meaning of "poor"[2] as used in Adhesive's Bulletin AE-187/1 designating the chemical resistance qualities of cured mortar Concresive 1097, Mr. Johnson replied:

I based my opinion on the fact it says "[f]ollowing figures are based on more than one year continuous total immersion." I did not expect them to have good acid resistance after one year, but I certainly thought if any-

[2]Bulletin AE-187/1 rated chemical resistance as "poor" to the following chemicals after more than 1 year of continuous total immersion: "sulphuric acid (70%), phosphoric acid (40%), nitric acid (30%), acetic acid (glacial), bleach, acetone, methyl ethyl ketone, diacetone alcohol, ethyl acetate, trichloroethylene, benzene and toluene."

thing was mentioned, "poor" was still functional after a year. If they had said disintegrates after a year, it would have posed a question.

Somewhat in conformity with Mr. Johnson's concept that poor chemical resistance could be equated with functional, as distinguished from disintegrating, it is quite apparent that the trial court distinguished functional from aesthetic.[3] The court's use of the term "functional" included not only the quality of preserving the substrate of concrete, per se, but also the qualities of overall physical integrity and usefulness as a floor, particularly contrasting such utilitarian qualities with concrete flooring. In that sense there is ample support in the record for both the fact and propriety of the challenged findings.

Error assigned to findings of fact 37, 38, 39 and 40 serves to introduce what appears to be Food Chemical's major assignment of error: That the trial court applied the wrong measure of damages. In order to properly evaluate the parties' arguments, it seems to us necessary to set forth each of the challenged findings:

### 37

*That the market value of the leasehold interest of the defendant, Food Chemical & Research Laboratories, Inc., has not been appreciably diminished by the installation of the floor covering, Concresive 1097-5.*

### 38

That the defendant, Food Chemical & Research Labo-

---

[3]In a memorandum opinion, the court commented: "From the evidence, it appears to me that there was an aesthetic damage done to the flooring that was not anticipated by the parties. The discoloration upon contact with the acids used in the laboratory, the discoloration caused by sunlight and the pockmarks all caused a lessening in the aesthetic value of the floor as compared to a beige floor of the kind ordered by Food Chemical.

"But no one, in my opinion, has sustained the burden of proving that the floor itself, as an industrial floor, has diminished in value. In other words, no one has convinced me, by a fair preponderance of the evidence, that the material of the floor has disintegrated. All of the evidence indicates that the floor, as far as the material is concerned, and the strength of the floor, is in excellent condition, much better than the floor in the laboratory that Food Chemical moved out of."

ratories, Inc., seeks damages in the amount of $11,139.54, being the cost of removing the present Concresive 1097-5 floor covering and replacing the same with another product.

### 39

That no party has sustained the burden of proving that it is necessary to remove the Concresive 1097-5 in order to apply another floor covering, *nor has any party sustained the burden of proving that there is any better floor covering than Concresive 1097 or that there is a floor covering that would be functionally better.*

### 40

*That it would be economically unsound and wasteful to remove the present epoxy floor covering Concresive 1097 and replace it with another floor covering, the qualities of which are at best speculative.*

(Once again, Food Chemical has assigned error only to the italicized portions of these findings.)

■ All parties agree that the proper measure of damages is set forth in 1 Restatement of Contracts § 346 (1) (a) (1932) at 572:

(1) For a breach by one who has contracted to construct a specified product, the other party can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable, determined as follows:

    (a) For defective or unfinished construction he can get judgment for either

        (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

        (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste.

*See Prier v. Refrigeration Eng'r Co.,* 74 Wn.2d 25, 442 P.2d

621 (1968); *Odgers v. Held,* 58 Wn.2d 247, 362 P.2d 261 (1961); *Baldwin v. Alberti,* 58 Wn.2d 243, 362 P.2d 258 (1961).

By its finding 40, the trial court determined as a matter of *fact,* that it would constitute economic waste to remove the existing epoxy floor. The conclusion which follows therefrom is that subsection (ii), difference in value, is the proper measure of damages. Further, by finding 37, the court determined that there was no appreciable diminution in value of the leasehold interest.

Appellant does not, in this appeal, argue with finding 40—and its conclusionary effect—nor with finding 38, as they each reflect upon Food Chemical's position prior to and during trial. However, appellant does insist that the unchallenged portion of finding 39—that neither party has sustained the burden of proving that it was necessary to remove the Concresive 1097-5 in order to apply another floor covering—renders finding 40 irrelevant. Therefore, continues the argument, cost of removal also becomes irrelevant; the damages are readily severable; the court should have measured damages under subsection (i) of the Restatement rule and thus award Food Chemical damages based upon the cost of completion, in conformance with the original contract (less only those elements of damages relating to cost of removal of the existing floor).

Conceding, for the sake of argument, that appellant may validly shift to its posttrial position as to the amount of damages because of the effect of a combination of findings of fact entered by the court, it appears to us that there are two circumstances, each of which is fatal to appellant's argument. First, the only evidence in the record bearing on the cost of completion of the contract is embodied in the testimony of the sales manager of a competing distributor, who repeatedly and emphatically declared that he would neither sell nor apply the competing product unless the existing floor was replaced. He further indicated that he made the bid under the express exception that "the existing coating on the floor would have to be removed." It

appears, therefore, that the elements of Food Chemical's proof of damages, as presented, are not severable.

Appellant directs our attention, however, to the testimony of the research director for Adhesive, who declared that such removal would be "foolish" and that an epoxy coating could be placed over the existing epoxy floor. Such testimony cannot be taken out of context. He expressed his knowledge of the competing product in this fashion:

Q  Are you familiar with the Sika[4] epoxy?

A  Yes, as a competitor.

Q  Could you put a Sika floor over the floor out there now?

A  You could do it but from what we know of their state of technology, we would have to put down either a dark aromatic amine floor. If they put a light color material down, they would have similar problems to ours; or else they could use another kind of curing agent which wouldn't be very chemically resistant.

Q  Do I understand the choice is between having a semi-resistant floor that won't change color or a floor that will change color and is chemically resistant?

A  Or the third is chemically resistant of a darker shade. This is my knowledge of what Sika are doing.

Appellant would select from the testimony of each of these two witnesses those portions which support its position. The trial court was also free to, and did, discount portions of the testimony of each of these witnesses. We have no way of knowing—nor need we concern ourselves with—which portions the trial court discounted. The trial court would have been quite justified to have found that the elements of appellant's proof of damages were not severable.

The second response to appellant's posttrial position (and its position on appeal) is that after having specifically found that the value of Food Chemical's leasehold interest had not been appreciably diminished by the installation of Concresive 1097-5, and after having specifically commented that he discounted the testimony of appellant's only

---

[4]The competing epoxy was a product of Sika Chemical Company of New Jersey.

witness who provided any basis for damages, the trial court was acting well within its authority as trier of the facts in awarding damages of $3,586.96, regardless of which subsection of § 346(a) of the Restatement it accepted. Such damages, being within the range of the totality of the evidence, will not be disturbed on appeal.

Finally, Food Chemical contends that the trial court should not have required it to pay the cost of initial installation to Marshall. Such a contention is inconsistent with the explicit wording of the Restatement rule. *See also* 3A A. Corbin, Contracts § 709 (1960).

Judgment affirmed.

PEARSON and ARMSTRONG, JJ., concur.